UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>BRYCE ALONZO WOOLF,<br><br>    Defendant. | Case No. 1:26-cr-00031-AKB<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

Pending before the Court is Defendant Bryce Alonzo Woolf's Motion to Suppress Tangible Evidence and Statements (Dkt. 22). On June 30, 2026, the Court heard oral argument (Dkt. 35). For the following reasons, the Court denies the motion.

## I.    BACKGROUND

On December 16, 2025, law enforcement searched Woolf's residence without a warrant based on their belief that Woolf's girlfriend—Julie Klungle—resided there (Dkt. 22 at 3). Klungle was on supervised release and one of the conditions of her supervision was the following warrantless, suspicionless search condition:

> The defendant shall submit her person, property, house, residence,
> vehicle, papers, computers (as defined in 18 [U.S.C.] § 1030(e)(1)),
> other electronic communications or data storage devices or media,
> or office, to a search conducted by a United States probation officer.
> The defendant shall warn any other occupants the premises may be
> subject to searches pursuant to this condition.

(Dkt. 27 at 2).

On December 4, 2025, United States Probation Officers (USPO) conducted a search of Klungle's reported residence on Cloverdale Road (Cloverdale residence), during which they found

methamphetamine in her wallet and drug paraphernalia in her car (Dkt. 27 at 3). Klungle was arrested and charged in state court (*id.*).

Following Klungle's arrest, officers interviewed Klungle's landlord who stated that Klungle rarely stayed there and had not regularly lived there for months, a sentiment he previously shared with officers in September 2025 (Dkt. 27 at 2–3). A search of Klungle's phone indicated drug use (Exs. 1008–10, 1012–13) that was inconsistent with the minimal amount of drugs and paraphernalia found at the Cloverdale residence (Dkt. 37 at 4). The phone search also showed that she frequently visited Woolf's residence and that Woolf's address was saved as "Home" in her phone (Exs. 1011, 1017). Based on that information, USPO had concerns that Klungle no longer resided at the Cloverdale residence and believed additional drugs would likely be found wherever she was actually residing (Dkt. 37 at 4). After listening to Klungle's phone calls in jail, USPO began to suspect that Klungle had moved in with Woolf.

On December 5, 2025, Klungle bonded out of jail before USPO could place a federal detainer on her for violating the terms of her supervised release (Dkt. 22 at 2). USPO discovered that Klungle was out on bond on December 6, at which point they began surveillance to determine whether Klungle was residing at Woolf's residence (Dkt. 37 at 3). Between December 6 and December 16, officers repeatedly observed Klungle's vehicle parked at Woolf's residence, including during early morning hours consistent with an overnight stay (Dkt. 32 ¶¶ 2–5; Dkt. 37 at 3). Officers also observed Klungle carrying a laundry basket into the residence (Dkt. 38 at 7). On December 9, officers returned to the Cloverdale residence and spoke with Klungle's landlord, who advised that although Klungle's rent was paid through the end of the month, she had moved some of her belongings—including her bed—out of the residence and that Woolf was helping her move (Dkt. 37 at 3). Based on the information gathered during the surveillance and investigation,

**MEMORANDUM DECISION AND ORDER – 2**

officers searched Woolf's residence on December 16 without a warrant pursuant to Klungle's supervised-release search condition (Dkt. 27 at 3–4; Dkt. 32 ¶ 5).

The search of Woolf's residence yielded "methamphetamine, marijuana, drug paraphernalia, and several firearms and silencers—some of which required registration in the National Firearms Registration and Transfer Record" (Dkt. 27 at 4). Woolf was charged with unlawfully possessing those unregistered firearms and silencers in violation of 26 U.S.C. §§ 5841, 5861(d), and 5871 (Dkt. 2 at 1).

On May 6, 2026, Woolf moved to suppress all evidence seized during the December 16 search and any post-search statements made to law enforcement or governmental agencies (Dkt. 22 at 1). The Government opposes the motion, arguing officers had probable cause to believe Klungle resided at Woolf's residence (Dkt. 27 at 6).

## II.   LEGAL STANDARD

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." It is a "basic principle of Fourth Amendment law . . . that searches and seizures inside a home without a warrant are presumptively unreasonable," *Kentucky v. King*, 563 U.S. 452, 459 (2011), "subject only to a few specifically established and well delineated exceptions." *United States v. Estrella*, 69 F.4th 958, 964 (9th Cir. 2023) (quoting *United States v. Brown*, 996 F.3d 998, 1004 (9th Cir. 2021)). One such exception is the "search of a parolee that complies with the terms of a valid search condition." *United States v. Cervantes*, 859 F.3d 1175, 1183 (9th Cir. 2017).

As the text indicates, the touchstone of the Fourth Amendment is reasonableness. *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). "The Fourth Amendment does not proscribe all state-initiated

MEMORANDUM DECISION AND ORDER – 3

searches and seizures; it merely proscribes those which are unreasonable." *Id.* When a defendant challenges a warrantless search or seizure, the government bears the burden of establishing by a preponderance of evidence that the search or seizure did not violate the Fourth Amendment. *United States v. Carbajal*, 956 F.2d 924, 930 (9th Cir. 1992); *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991); *see also United States v. Jeffers*, 342 U.S. 48, 51 (1951).

### III.    ANALYSIS

Woolf contends that the Government's warrantless search of his residence violated his Fourth Amendment rights because neither he nor Klungle consented to the search and Klungle's Fourth Amendment waiver as a condition of her federal supervised release did not extend to Woolf's residence (Dkt. 22 at 3–4).

It is undisputed that Klungle was subject to a warrantless, suspicionless search of her house or residence as a term of supervised release (Dkt. 27 at 2). "But the police must 'be reasonably sure that they are at the *right* house'; a parolee's diminished expectation of privacy cannot 'justify the entry into and search of a third person's house to search for the parolee.'" *United States v. Ped*, 943 F.3d 427, 430 (9th Cir. 2019) (citation modified) (quoting *Motley v. Parks*, 432 F.3d 1072, 1079 (9th Cir. 2005) (en banc), *overruled in part on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (en banc) (per curiam)). Therefore, before searching a residence, law enforcement "must have probable cause to believe that the parolee is a resident of the house to be searched." *United States v. Grandberry*, 730 F.3d 968, 973, 975 (9th Cir. 2013) (quoting *United States v. Howard*, 447 F.3d 1257, 1262 (9th Cir. 2006)). "[T]his 'degree of knowledge' is a 'precondition for a search pursuant to a parole condition.'" *United States v. Dixon*, 984 F.3d 814, 821 (9th Cir. 2020) (quoting *Grandberry*, 730 F.3d at 975).

**MEMORANDUM DECISION AND ORDER – 4**

To protect the interests of a third-party resident who is not subject to the same diminished expectations of privacy as a supervisee, "officers must conduct further inquiries before searching residences that were not previously reported by the [supervisee]." *Ped*, 943 F.3d at 431. As explained by the Ninth Circuit,

> Nothing in the law justifies the entry into a search of a third person's house to search for the [supervisee]. The Fourth Amendment's protection against unreasonable searches in a person's home is not diminished by the mere presence of a guest in the home. In other words, the [supervised release] condition indicates only the [supervisee's] acquiescence to a warrantless search of his own residence. Absent this provision and the existence of exigent circumstances, officers must obtain consent or a warrant to enter a house.

*Motley*, 432 F.3d at 1079 (citation modified). Accordingly, before officers can search a residential address other than the address "the parolee officially and consistently reported," the officers must have "an affirmative and substantial basis for concluding that [she] did not actually live there." *Grandberry*, 730 F.3d at 977.

Here, officers had an affirmative and substantial basis for concluding Klungle did not actually live at the Cloverdale address. Between May and September 2025, Klungle "had missed multiple visits by probation officers to her reported residence on Cloverdale Road," and had only a 50 percent success rate for her home visits (Dkt. 27 at 2; Dkt. 38 at 5). On September 2, 2025, and during the December 4 search of the Cloverdale residence, Klungle's landlord informed officers that Klungle "rarely" stayed there and had not regularly lived there for months (Dkt. 27 at 3). Officer Baker testified that, on December 4, after the search, USPO spoke to another supervisee who had been texting with Klungle. The supervisee acknowledged that she and Klungle had used drugs at "Julie's boyfriend's house" around Thanksgiving and described Woolf's residence as a "tweaker's paradise" (Dkt. 37 at 5). While Klungle was in jail, she made several calls indicating that she intended to reside with Woolf. For example, during a phone call with her mother, Klungle

**MEMORANDUM DECISION AND ORDER – 5**

discussed moving out of the Cloverdale residence and stated that she would need to ask Woolf if she could stay at his house and that she would only go to her "apartment" to clean it out (Ex. 1020 at 18:52, 24:40–25:02). In another jail call with a bail bonds company, Klungle told the bondsman to call Woolf to get ahold of her because she will "be with him the whole time" (Ex. 1022 at 3:38–3:46). On the other hand, Klungle repeatedly referenced the Cloverdale residence as "her apartment" or home during the jail calls (Ex. 1019 at 2:02, 5:36; Ex. 1022 at 1:11–1:24, 5:43–5:40), while referring to Woolf's residence as "your home" (Ex. 1019 at 20:22–20:46). Additionally, when the bondsman asked for her address, Klungle provided the Cloverdale address and stated she had been renting there for eight months (Ex. 1022 at 2:10–2:30). In her last jail call to Woolf, however, Klungle told him that she was "ready to come home," suggesting she was returning to Woolf's residence, and that Woolf would need to "take her everywhere" after she bonded out because she may not have her vehicle (Ex 1021 at 1:15–1:28, 3:05–3:10).

After USPO learned that Klungle had bonded out on December 5, 2025, they began conducting surveillance to confirm their suspicion that Klungle no longer lived at the Cloverdale residence. On December 6, USPO drove by Woolf's residence at 2:10 p.m. and 6:30 p.m. and observed Klungle's car parked in the driveway (Ex. 1026). During the 2:10 p.m. visit, Officer Ellenburg observed Klungle "carrying a laundry basket full of stuff" into Woolf's residence. Officer Ellenburg also testified that on December 9, she and Officer Baker stopped by the Cloverdale residence and spoke with the landlord, who advised that Klungle was not staying at the residence but that she was paid up until the end of the month. He indicated that she was already moving all of her stuff, including her bed, out of the residence. Although the landlord was unaware of where she was moving to, he indicated that Woolf was helping her. Thus, officers had an

affirmative and substantial basis for concluding Klungle did not actually live at the address she had reported to probation.

The Court next turns to whether, under the totality of the circumstances, officers had probable cause to believe that Klungle was residing at Woolf's residence. Probable cause exists only if the facts known to law enforcement *at the time of the search* were sufficient to support a belief in an officer of "reasonable caution" that the supervisee lived at the searched residence. *Grandberry*, 730 F.3d at 975 (quoting *United States v. Diaz,* 491 F.3d 1074, 1077–78 (9th Cir. 2007)). This is a stringent standard—"[t]here must be strong evidence" that the supervisee resides at the address. *Id.* at 975–76.

The Ninth Circuit in *Grandberry* identified several factors to guide the probable-cause-as-to-residence analysis: (1) "the [supervisee] did not appear to be residing at any address other than the one searched"; (2) "the officers had directly observed something that gave [them] good reason to suspect that the [supervisee] was using an unreported residence as [her] home base"; (3) "the [supervisee] had a key to the residence in question"; and (4) "either the [supervisee's] co-resident or the [supervisee herself] identified the residence in question as that of the [supervisee]." 730 F.3d at 976 (quoting *Howard*, 447 F.3d at 1265–66); *see also United States v. Barry*, 140 F.4th 1105, 1109 (9th Cir. 2025). The Ninth Circuit has emphasized the fact-intensive nature of the inquiry, noting that courts should apply a "common-sensical standard" of probable cause and examine the totality of the circumstances to determine whether there was a "fair probability" that a supervisee resides at a particular address. *United States v. Hopkins*, 830 F. App'x 220, 221–22 (9th Cir. 2020) (first quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013); then quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).

MEMORANDUM DECISION AND ORDER – 7

First, Klungle did not appear to be residing at any other address than Woolf's. Between December 6 and 16, officers surveilled the Woolf residence on numerous occasions after Klungle bonded out and before they searched the residence (*see* Dkt. 32 ¶¶ 2–5). Officers observed Klungle's red vehicle at the Woolf residence eleven times and at times consistent with her staying overnight (*id.*; Dkt. 37 at 3). When officers visited the Cloverdale residence on December 9, the apartment was unoccupied (Dkt. 37 at 3). Further, the Cloverdale landlord indicated that although her rent was paid through December, she had been moving her personal items out of the residence, including her bed (*id.*). Mere observation of the supervisee at the residence to be searched is not sufficient to establish probable cause. *United States v. Franklin*, 603 F.3d 652, 657 (9th Cir. 2010) ("That a house or apartment belonging to someone else is also the 'residence' of a [supervisee] is not an inference that can be drawn simply because the [supervisee] happens to be seen there."). Nor is it enough that the supervisee may have "spent the night there occasionally." *Grandberry*, 730 F.3d at 978; *see also Howard*, 447 F.3d at 1262, *overruled in part on other grounds by King*, 687 F.3d 1189. Here, however, officers did not rely solely on Klungle's presence at Woolf's residence or isolated overnight stays. Rather, they observed repeated overnight activity at the residence, observed Klungle's vehicle there on eleven occasions, and learned that she had moved out of the Cloverdale residence. Taken together, these facts supported a reasonable inference that Klungle was residing at Woolf's residence.

Second, Officers Ellenburg and Baker directly observed multiple things that gave them good reason to suspect that Klungle was using Woolf's residence as her residence. A search of Klungle's cellphone on December 4, 2025, showed that Klungle frequented Woolf's residence (Ex. 1011) and that she had marked his address as "Home" in her phone (Ex. 1017). Officer Ellenburg observed Klungle carrying a laundry basket into Woolf's residence (Dkt. 22 at 4–5;

**MEMORANDUM DECISION AND ORDER – 8**

Dkt. 27 at 3). There was also a photograph dated September 8 of a package addressed to Klungle with Woolf's address with a text message describing the package as "part" (Exs. 1014, 1015). Although Woolf maintains that Klungle ordered and sent the part for her motorcycle to Woolf because he was repairing her motorcycle (Dkt. 22 at 4), that information was unknown to officers before the search. Finally, at 6:30 a.m. on the morning of the search, officers observed Klungle's vehicle parked in Woolf's driveway (Dkt. 32 ¶ 4). The Court finds these observations provided officers with good reason to believe Klungle was using Woolf's residence as her residence.

The third factor—whether Klungle had a key to the residence in question, is neutral. The Government submitted screenshots of Klungle's phone depicting text messages between her and Woolf in May 2025 wherein Woolf gave Klungle the code to his garage door (Ex. 1018). In another text dated September 8, Klungle informs Woolf that she "used the garage code to get in" when he was not there (Ex. 1016).

A supervisee's possession and use of a key alone does not establish probable cause. *Grandberry*, 730 F.3d at 979. In examining this fact, the Ninth Circuit explained that the court should look at why "someone entrusted [the supervisee] with a key in the first place," the frequency and duration of key use, and how the key is being used, such as to stay overnight or to use the residence for illicit purposes. *Id.* at 979–80. Here, Woolf testified that a few months prior to the search, Klungle had taken care of him for approximately two months while he was recovering from an injury from a motorcycle accident. It is reasonable to infer that Klungle continued to use the garage code to access the residence while Woolf was recovering. He also testified that Klungle occasionally stayed at his house overnight, which is consistent with her possession of the garage code and use of it when Woolf was not there (Ex. 1016).

**MEMORANDUM DECISION AND ORDER – 9**

At the evidentiary hearing, Woolf testified that he had changed the garage code previously given to Klungle before the December 16 search and that when Klungle came to his house, she would knock on the front door. But officers were unaware of those facts at the time of the search. Instead, the information available to them showed that Woolf had provided Klungle with the garage code, she had previously used it to enter the residence while he was away, and nothing suggested that her access had since been revoked. Thus, although Klungle's possession of the garage code does not independently establish probable cause that she resided at the residence, it reasonably supported the officers' belief that she continued to have authorized access to the home.

The final factor, which looks at whether Woolf or Klungle identified Woolf's residence as that of Klungle, is also neutral. Although Klungle and Woolf both deny that she resided at his residence (Dkt. 22 at 3), Woolf testified that he "offered Ms. Klungle a place to temporarily stay and store her belongings" after she was released on bond for a state offense because they believed she would be placed in federal custody for violating the terms of her supervised release (Dkt. 23 ¶ 14). He maintains that the temporary nature of her stay with him "does not constitute a change of residence" and that Klungle maintained her Cloverdale residence (Dkt. 22 at 4).

However, mere denial "from a less-than-disinterested source" that a supervisee does not reside at a particular residence is not sufficient to "undermine the information the officers previously had received." *Motley*, 432 F.3d at 1082. Woolf testified that he had discussed marriage with Klungle, but that he "feel[s] like [he is] putting [himself] in trouble by trying to make anything more of [their] relationship right now" and that "[he] [does not] want anybody being in prison and jail." Accordingly, the Court affords little weight to Woolf's denial that Klungle resided with him because it is "tinged with self-interest." *Howard*, 447 F.3d at 1266 n.13. On the other hand, Klungle's landlord's statement that she no longer resided at the Cloverdale residence and that

**MEMORANDUM DECISION AND ORDER – 10**

Woolf had helped move her belongings supports a finding of probable cause because the landlord had no interest in the outcome of the officers' investigation.

Additionally, "[i]t is immaterial that [Klungle] had not lived at [Woolf's] address for a long period of time." *United States v. Dally*, 606 F.2d 861, 863 (9th Cir. 1979). Probable cause is determined based on the facts known to officers at the time of the search. Thus, contrary to Woolf's assertions, it is immaterial that most of Klungle's belongings inside Woolf's residence were still in boxes; her motorcycle was temporarily in Woolf's shed while he worked on it; or Klungle's intent was to temporarily move her belongings into Woolf's residence in preparation for her return to custody (Dkt. 22 at 5). None of these facts were known to officers at the time they searched Woolf's residence. Accordingly, they are not relevant to the officers' probable cause. *See Grandberry*, 730 F.3d at 976 n.6 (noting defendant's affidavit that he occasionally stayed overnight was not relevant to probable cause determination because it was not known to officers at the time of search).

Considering the totality of the circumstances, the facts available to Officers Ellenburg and Baker established probable cause to believe that Klungle resided at Woolf's residence. Accordingly, the officers' warrantless search of Woolf's residence did not violate his Fourth Amendment rights, and there is no basis to exclude evidence seized therein.

Finally, and for the first time in his written closing argument, Woolf argues that officers' protective sweep of his residence was improper because Woolf and Klungle were outside the residence and, thus, no longer a threat to law enforcement (Dkt. 38 at 8). Woolf also argues that officers exceeded the scope of the search by going beyond common areas and shared spaces (*id.*). It is a basic and well-established rule that parties are not permitted to introduce new arguments or evidence without providing the opposing party an opportunity to respond. *Dutta v. State Farm*

MEMORANDUM DECISION AND ORDER – 11

*Mut. Auto. Ins. Co.*, 895 F.3d 1166, 1171–72 (9th Cir. 2018). Thus, the Court need not consider claims raised for the first time on reply. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007); *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006). Although Woolf's arguments were raised in his written closing argument rather than a reply brief, the principle applies with equal force.

## IV.    ORDER

**IT IS ORDERED that:**

1.      Defendant Bryce Alonzo Woolf's Motion to Suppress Tangible Evidence and Statements (Dkt. 22) is **DENIED**.

2.      The period of time between the filing of the Motion to Suppress and this Order is deemed EXCLUDABLE TIME under the Speedy Trial Act, 18 U.S.C. § 3161(h)(1)(D).

3.      Trial in this matter is scheduled for **September 14, 2026, at 1:30 p.m.** in the United States Courthouse in Boise, Idaho.

4.      The trial readiness conference shall be conducted by telephone on **September 3, 2026, at 4:00 p.m. (mountain time)**. The Government shall place the call to (208) 334-9205 with opposing counsel on the line.

5.      All pretrial motions, except motions in limine, shall be filed on or before **July 31, 2026**. Motions in limine shall be filed on or before **August 14, 2026**.

DATED: July 20, 2026

*Amanda K. Brailsford*
Amanda K. Brailsford
U.S. District Court Judge

**MEMORANDUM DECISION AND ORDER – 12**